J^GREMILLION, Judge.
In this case, the defendant, L.C., appeals the judgment of the trial court terminating his parental rights in favor of the plaintiff, the State of Louisiana.[1] For the following reasons, we reverse.
FACTUAL AND PROCEDURAL BACKGROUND
L.C. fathered a child born on December 25, 1991, hereinafter referred to as J.C., with E.D. L.C. lived with E.D. for some time before separating from her, and he was incarcerated in a Texas prison in 1994, when J.C. was three years old.[2] L.C. remained incarcerated up until the time of trial.[3]
J.C.’s first placement in foster care was from June 1993 to December 1994. Thereafter, he was returned to E.D.’s custody. In September 1996, J.C. and his half sister were taken away from E.D. by the State of Louisiana through the Department of Social Services (DSS) because of her physical abuse and medical and physical neglect of them. They have remained in foster care in Rapides Parish since that time. It appears from the record that L.C. was first notified that the State had custody of J.C. by a letter sent to the prison sometime in December 1996. According to the record, the permanent case plan for J.C. was changed from “reunification with the parents” to “Adoption” in September 1998.
Following a trial on the merits, judgment was rendered by the trial court on January 19, 2001, terminating L.C.’s parental rights and releasing J.C. for 12adoption by others. L.C. filed this appeal in February 2001, and was released from incarceration in March 2001. While the appeal was pending, L.C. filed a motion for child visitation in March 2001.
LAW
L.C. urges that the trial court erred in terminating his parental rights to J.C. because the State failed to prove termination was in J.C.’s best interests as mandated by La.Ch.Code art. 1037(A).
We set forth the burden of proof the State must meet when terminating parental rights in State in the Interest of Q.P., 94-609, p. 4 (La.App. 3 Cir. 11/2/94) 649 So.2d 512, 515:
*846 Parental rights to the care, custody, and management of children is a fundamental liberty interest warranting great deference and vigilant protection under the law. State in the Interest of C.P., 463 So.2d 899 (La-App. 2 Cir.1985). On this basis, the Louisiana legislature imposed statutorily strict procedural and evidentiary requirements which must be met before issuance of a judgment terminating parental rights. As explained in State in the Interest of J, 582 So.2d 269 (La.App. 1 Cir.), writ denied, 583 So.2d 1145 (La.1991), the evidentiary standard established in termination cases mandates that the State present proof by clear and convincing evidence of the parents’ failure to comply with all the enumerated conditions relied upon in the specific paragraph(s) of LSA-Ch.C. Art. 1015 before terminating parental rights. Accordingly, this heightened burden of proof requires the State to show not only that the existence of the fact sought to be established is more probable, but rather that the fact is highly probable or more certain. Hines v. Williams, 567 So.2d 1139 (La.App. 2 Cir.), writ denied, 571 So.2d 653 (La.1990). However, we are mindful that in assessing whether the clear and convincing evidentiary standard was followed in the lowdr court, we must determine whether the record reflects that the juvenile court manifestly erred. Rosell v. ESCO, 549 So.2d 840 (La.1989).
We find that the trial court was clearly wrong in terminating L.C.’s parental rights.
| «The State’s petition alleging that the parental rights of L.C. should be terminated does not specifically allege upon which ground(s) the termination is based.[4] Presumably, this ground is rooted in La.Ch. Code art. 1015(6), as urged by L.C. in his brief. Article 1015(6) sets forth the grounds for the involuntary termination of an incarcerated parent:
The child is in the custody of the department pursuant to a court order or placement by the parent; the parent has been convicted and sentenced to a period of incarceration of such duration that the parent will not be able to care for the child for an extended period of time, considering the child’s age and his need for a safe, stable, and a permanent home; and despite notice by the department, the parent has refused or failed to provide a reasonable plan for the appropriate care of the child other than foster care.
We are also aware of comment (f) to Article 1015, which states:
The source of Paragraph (6) is former Art. 1015(6). The parent’s lengthy incarceration is a widely recognized justification for termination of parental rights and has been a ground in this state since 1981. This ground recognizes the disruption of the parent-child relationship that inevitably occurs when the parent is convicted and sentenced to a long term of imprisonment.
Article 1036(D) recognizes a presumption that a five-year prison term during which a child is in foster care is such a substantial period of time that the parent-child relationship will be irreparably disrupted and the child will be at grave risk of substantial harm.
*847 La.Ch.Code art. 1036(D)(2), entitled “Proof of Parental misconduct,” states:
D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
[[Image here]]
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
Additionally, the requirements of La.Ch. Code art. 1037(A) must be satisfied. It states:
When the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven true by the evi-dentiary standards required by Article 1035 and that it is in the best interest of the child, it shall order the termination of the parental rights of the parent against whom the allegations are proven.
(Emphasis added).
Thus, we address whether the State proved by clear and convincing evidence that (1) the grounds in Article 1015(6) were met and (2) whether the termination was in the best interest of J.C.
The evidence adduced at trial does not convince us that the termination of L.C.’s parental rights were in J.C.’s best interest. The first DSS caseworker, Marcie Webb, was involved with J.C. from September 1996 to December 1997. She did not testify. Carola Whitehurst, a former employee of DSS, was the second caseworker involved with J.C. She testified that L.C. was first contacted on September 3, 1997, via a form letter sent by Webb to notify him of a “family team conference,” but that the first letter from L.C. to the agency was dated December 9, 1996, and received by Webb on December 13, 1996, some ten months before DSS’s self-proclaimed first contact with him.[5] In that letter, L.C. expressed concern for J.C: |sand stated that he had trouble contacting him through E.D., who was not cooperating with his efforts. Further, there are letters in the record indicating that DSS had been in contact with L.C. since December 1996.
The record reveals that Webb next sent out a letter in January 1997, to the social worker at the prison regarding L.C.’s legal rights concerning J.C. His signature on the forms was requested; however, White-hurst testified that the return forms were missing, if they had ever been received. Thus, she resent the letter in December 1998, close to two years after the original letter was sent. The letter stated:
You are hereby notified you must now provide a plan for the appropriate care of your child other than continued foster care as soon as possible. If you fail or refuse to do so you may lose all your rights to your children or your child. Your plan will be examined to reveal if it is appropriate. Please provide your plan in detail no later than January the 15th of ’99, to the case worker.
L.C. promptly returned the requested documents in late December 1998, and provided DSS with the name, address, and phone number of his aunt as a possible caretaker for J.C. However, his aunt was unable to care for him due to her and her husband’s poor health and other family obligations. When J.C.’s placement with the aunt was no longer a viable option, DSS moved for *848 ward in pursuit of terminating L.C.’s parental rights with adoption of J.C. as the ultimate goal, as evidenced by a letter written in April 1999, advising the trial court of said plan.
Whitehurst testified that L.C. would have been notified in the normal course of events that the aunt would be unavailable, however, she could not find any letter in the file evidencing that he was indeed notified. Nevertheless, she later testified that L.C. was notified by letter on June 3,1999, that placement with the aunt |fiwas not a viable alternative. She further stated that the substance of that letter was purely to notify him that the aunt was not a possibility and not to request or solicit other suggestions from him. When questioned by L.C.’s counsel whether she had any other documentation to indicate that she had solicited other names for placement from J.C., Whitehurst replied, “No, sir, I don’t have.” She also stated that L.C. did not provide her with any other names of persons who could possibly take care of J.C. through her employment in September 1998. Thereafter, in July 1999, the State filed a petition for termination of parental rights naming L.C. as one of the defendants.
Whiitehurst further testified that, in regard to J.C., L.C. was “very faithful in writing to the agency and to his son wanting to know about his son,” and that he “regularly kept in touch with the agency as to inquiring about his son.”
Linda Strange, a foster care worker for J.C. since October 2000, testified that she notified L.C. that she would be the worker in the case from that point on. She testified that L.C. had written “several” letters to both her and his son, and that she had not received any other information regarding a possible placement for J.C. At trial, it was estimated that at least thirty letters were written by L.C. to his son and/or the agency. Both Whitehurst and Strange testified that L.C. has not seen or spoken with J.C. since his incarceration.
Next, Brad Perkins, the foster father testified as to J.C.’s “normal sibling relationship” that he shares with his half sister. He also went on to discuss J.C.’s special needs due to his Charcot Marie Tooth Disease, which he stated makes J.C. weak and not as developed as other children.
17E.D. testified that while she and L.C. were together, he would care for J.C.’s needs including changing diapers, feeding him, and putting him to bed, but that once they separated he never visited J.C. However, she also stated that the last time L.C. saw J.C. he was “two or three,” thus, coinciding with the time he became incarcerated.
L.C. himself testified via telephone from the penitentiary. He stated that he visited with J.C. twenty to thirty times after his separation from E.D., but before his incarceration. He also stated that he provided three names to DSS regarding the possible placement of J.C. and that he is better suited to care for his son upon his release because he shares the Charcot Marie Tooth Disease that J.C. is afflicted with. He also testified that he is a Certified Nursing Assistant and able to work in construction. He claimed to have copies of sixty to seventy letters he has written to J.C. during his incarceration, but he admitted that he had not seen or spoken to J.C. in over seven years.
J.C. spoke to the court and stated that he receives letters from his dad stating that his dad misses him and wishes he could see him. J.C. testified that he would be “sad” if he no longer received the letters from his dad. WTien asked by the court if he thought it would be important that he continue seeing his dad, he replied *849 “yes,” and that he would be “very sad” if he had no further communication with him. J.C. further stated that he thought “it would be very nice” if he were able to live with his dad, but that he would miss his foster parents and half sister.
In its oral reasons for judgment, the trial court stated that it felt the State had met its burden of proof against L.C. primarily because (1) the request for an ^alternative plan was submitted “multiple times” and L.C. only provided one name and, (2) the length of his prison sentence being ten years. The trial court did find that “the idea of his father” is important to J.C. and elected to reserve the issue of L.C.’s visitation with J.C. until a later time. It went on to state:
I would' — -I would advise the agency, however, that I am concerned about this child’s need to understand the father’s location. He has a very active idea about this father. A very glorified idea about father. And could experience some great disappointment if and when, if the father should discontinue the letters. I think everybody has to be pre- . pared for that. He has a disability the father shares. There is much this father could offer, perhaps, as a visitation resource and in the event that the child, on subsequent reviews, exhibits some reason for us, the court would consider, at least consider, visitation by this father even though the rights would be terminated. In the event that Mr. [C.] actually gets out, comes to some nearby place and it could be possible to do it in a manner that’s in the best interest of the child. But, at this time, I cannot see that that’s actually going to happen. And, therefore, I believe that termination is in the best interest of the child.
DSS’s own records clearly indicate that L.C. has made substantial efforts to keep in contact with J.C. and to maintain the father-son relationship to the best of his ability. Although we certainly do not condone or excuse his behavior and, in fact, may have agreed that termination of L.C.’s rights would have been appropriate under Article 1015(6) in 1994, at this stage of his incarceration we do not feel it was proven by clear and convincing evidence that termination would be in the best interests of J.C.
It is apparent that L.C.’s release from prison was imminent. Visitation, as suggested by the trial court, is not an appropriate alternative for a parent to initiate when his rights have been terminated. See La.Ch.Code art. 1037.1. Thus, we feel it is in the best interests of J.C. to allow L.C. an opportunity to provide his son with the | Jove, care, and support he requires. L.C. has expressed a strong desire in being a parent to J.C. and J.C. clearly values the relationship. There were no allegations or indications that J.C. was placed into foster care due to the neglect or abuse by L.C. Primarily, it appears the decision was made because he could not formulate an alternative placement plan for J.C. The need for alternative placement should no longer exist upon L.C.’s release from prison. Finally, there is no evidence in the record which would indicate that J.C., a nine year old boy with an ongoing medical problem, has anyone who' wishes to adopt him.
Moreover, we find the inconsistencies in the State’s testimony and record-keeping skills to be telling. Whether L.C. received an appropriate opportunity to provide an alternative placement for J.C. is questionable. It appears that only one month elapsed between L.C.’s receipt of the letter indicating that his aunt was not a viable alternative and the filing of the petition for termination, whereas almost two years had elapsed since J.C. had been placed in foster care before there is any record that *850 L.C. received notice that it was his legal responsibility to provide an alternative placement. Thus, under La. Ch. Code art. 1505(6), we do not find that the onerous clear and convincing standard of proof was met. Additionally, because of the particular circumstances of this case, we do not think the best interests of J.C. would be served by terminating L.C.’s rights. While time may show that L.C. will not be able to properly care for J.C., to deprive J.C. of the opportunity to be raised by his father is not in his best interest particularly in light of the fact that there appears no one likely to adopt him. Thus, we remand this case for disposition according to our findings and direct DSS to work toward reunification with L.C.
REVERSED AND REMANDED.

. Initials are used to protect the privacy of the juvenile.

. L.C. was imprisoned for aggravated robbery.

.L.C. testified and the record reflects that he was to be released from prison within a few months of the January 19, 2001 hearing.

. The petition for termination states: "[L.C.] is presently incarcerated by the State of Texas and will be reviewed for possible release in July of 2000. His maximum full time release date is calculated to be July 20, 2004. Respondent is presently unable to care for this child and, despite notice by the Department has failed to provide a reasonable plan for the appropriate care of this child other than foster care.”

. Whitehurst further testified that included in the same envelope was a letter to J.C. signed "Love, Dad.”