STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

08-1103

STATE IN THE INTEREST OF

B.O.G., D.D.G., B.T.G., AND K.M.G.

************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2006-0860
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

************

JAMES T. GENOVESE
JUDGE

************

Court composed of Oswald A. Decuir, J. David Painter, and James T. Genovese,
Judges.

AFFIRMED IN PART; REVERSED IN PART;
AND REMANDED.

Donald D. Cleveland
820 East St. Mary Boulevard, Suite One
Post Office Box 3611
Lafayette, Louisiana 70502-3611
(337) 235-5791
COUNSEL FOR DEFENDANT/APPELLANT:
    J.K.R.

Lloyd Dangerfield
703 East University Avenue
Lafayette, Louisiana 70503
(337) 232-7041
COUNSEL FOR DEFENDANT/APPELLANT:
    K.J.G.

**Allyson M. Prejean**
**1313 Lafayette Street**
**Post Office Box 3862**
**Lafayette, Louisiana 70502**
**(337)  288-4028**
**COUNSEL FOR MINORS/APPELLEES:**
       **K.M.G., B.O.G., D.D.G., and B.T.G.**

**Vivian Neumann**
**730 Jefferson Street**
**Lafayette, Louisiana 70501**
**(337) 261-0079**
**COUNSEL FOR DEFENDANT/APPELLEE**
       **C.G.**

**John A. Hernandez, III**
**321 West Main Street, Suite 2-G**
**Lafayette, Louisiana 70501**
**(337) 233-5330**
**COUNSEL FOR DEFENDANT/APPELLEE:**
       **D.B.**

**Paula Dossmann**
**825 Kaliste Saloom Road, Brandywine II, Suite 104**
**Lafayette, Louisiana 70508**
**(337) 262-5901**
**COUNSEL FOR APPELLEE:**
       **State of Louisiana**

**Dawn M. Fuqua**
**L. Antoinette Beard**
**825 Kaliste Saloom Road, Brandywine I, Room 218**
**Lafayette, Louisiana 70508**
**(337) 262-5913**
**COUNSEL FOR APPELLEE:**
       **State of Louisiana**

**Michael Harson, District Attorney**
**Michelle M. Breaux -ADA**
**Fifteenth Judicial District**
**Post Office Box 3306**
**Lafayette, Louisiana 70502**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
       **State of Louisiana**

**GENOVESE, Judge.**

K.J.G.,[1] the biological father of the minor children B.O.G. and D.D.G., and J.R., the biological father of the minor child, K.M.G., appeal a judgment of the trial court terminating their respective parental rights and certifying their minor children eligible for adoption. For the following reasons, we affirm the termination of the parental rights of J.R., reverse the termination of the parental rights of K.J.G., and remand the matter relative to the minor children, B.O.G. and D.D.G., for the reinstitution of juvenile proceedings.

## FACTS

The minor children, B.O.G. (date of birth 1/31/99), D.D.G. (date of birth 8/29/00), and K.M.G. (date of birth 7/15/06), along with another sibling, B.T.G, were placed in the care of the State of Louisiana, through its Department of Social Services (DSS), Office of Community Services (OCS or State), pursuant to an instanter order issued August 21, 2006, based upon allegations of lack of supervision by their mother, C.G., with whom they resided. Upon arrival at the home, law enforcement officials found that the children had been left alone for an extended period of time; consequently, C.G. was arrested for child abandonment.

B.O.G., D.D.G., and K.M.G., were placed in the home of their maternal aunt and uncle. The children were adjudicated as children in need of care pursuant to La.Ch.Code art. 666[2] on September 26, 2006. The minor children have remained in the custody of their maternal aunt and uncle since being placed in their home in August of 2006.

---

[1]Pursuant to Uniform Rules—Courts of Appeal, Rules 5-1 and 5-2, the initials of the parties will be used to protect and maintain the privacy of the minor children involved in this proceeding.

[2]Louisiana Children's Code Article 666 provides, in pertinent part, "Following the adjudication hearing, the court shall immediately declare whether the evidence warrants a child in need of care adjudication."

The initial case plan was established in September of 2006 with a goal toward reunification of the children with their parents. The goal of subsequent case plans remained reunification from September of 2006 through August of 2007. The trial court conducted review hearings, approved each of the case plans, and maintained the custody of the children with the State. In August of 2007, however, the State's goal changed from reunification of the children with their parents to that of adoption, which was approved by the trial court.

In February of 2008, the State recommended that the case plan goal be changed back to reunification, but the review hearing was continued by the trial court due to a lack of service on C.G., and the recommended goal of adoption never did revert back to reunification. The trial court approved the subsequent case plan in May of 2008 with a goal of adoption and maintained the custody of the children with the State.

In the interim, on March 19, 2008, the State filed a Petition for Termination of Parental Rights and Certification for Adoption. A termination hearing was held on June 24, 2008, wherein the trial court terminated the parental rights of K.J.G. and J.R.[3] pursuant to La.Ch.Code art. 1015(4) and (5).[4] A judgment terminating the parental

---

[3]The judgment of the trial court also terminated the parental rights of C.G., the parental rights of D.B., and the "Unknown and/or Unidentified Father" of another minor child, B.T.G. These individuals did not appeal; thus, the termination of their parental rights is not presently before this court.

[4]Louisiana Children's Code Article 1015 provides, in relevant part, as follows:

The grounds for termination of parental rights are:

. . . .

(4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:

(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.

2

rights of K.J.G. and J.R. was signed by the trial court on July 1, 2008. It is from this judgment that K.J.G. and J.R. appeal.

## ASSIGNMENTS OF ERROR

K.J.G. asserts the following assignments of error:

1.    The trial court erred in terminating the rights of [K.J.G.,] the non-offending parent, for substantial non-compliance when he had completed several components of the case plan and was recently involved in mental health counseling.

2.    The trial court erred in terminating the rights of [K.J.G.] where there had been improvement and a reasonable expectation for further improvement in the parent's condition.

3.    The trial court erred in finding that termination was in the best interest of the children when considering the relation with the father.

4.    [OCS] failed to prove abandonment on the part of the father, [K.J.G.].

J.R. asserts only one assignment of error:

[1.]    The trial [c]ourt erred in terminating the parental rights of the Appellant, [J.R.].

## LAW AND DISCUSSION

Our Louisiana Supreme Court has stated the following relative to the

---

(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

(5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

termination of parental rights:

> An appellate court reviews a trial court's findings as to whether parental rights should be terminated according to the manifest error standard. *State ex rel. J.W.*, 01-500 (La.App. 4 Cir. 11/14/01), 801 So.2d 1182. In two recent cases, we discussed the concerns regarding the involuntary termination of parental rights by the state, as follows:

>> In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent.

>> The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven.

>> Title X of the Children's Code governs the involuntary termination of parental rights. La. Child. Code art. 1015 provides the statutory grounds by which a court

4

may involuntarily terminate the rights and privileges of parents. The State need establish only one ground, La. Child. Code art. 1015, but the judge must also find that the termination is in the best interest of the child. La. Child. Code. art. 1039. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. La. Child. Code art. 1035(A). (Cites omitted.)

> *State in the Interest of J.A.*, 99-2905 (La.1/12/00), 752 So.2d 806, 810-811; *see also State ex rel. C.J.K.*, 00-2375 (La.11/28/00), 774 So.2d 107.

*State ex rel. K.G.*, 02-2886. pp. 4-5 (La. 3/18/03), 841 So.2d 759, 762-63.

In the case at bar, the trial court found that the State had met its burden of proof by clear and convincing evidence that the termination of the parental rights of K.J.G. and J.R. was in the best interest of the minor children.

**TERMINATION OF J.R.'S PARENTAL RIGHTS**

J.R. contends that the trial court erred in terminating his parental rights. Specifically, he raises the issue of whether the State "proved by clear and convincing evidence that it was in the *best interest* of [K.M.G.] to terminate the rights of [J.R.]" (emphasis added).

With respect to J.R., the Petition for Termination of Parental Rights and Certification for Adoption alleges that he failed to provide significant contributions to his minor child's care and support for six months and that he failed to maintain significant contact with the child by visiting or communicating with the child for any period of six consecutive months.[5] J.R. does not dispute these factual assertions on

---

[5]Louisiana Children's Code Article 1036 provides, in relevant part, as follows:

C. Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:

(1) The parent's failure to attend court-approved scheduled visitations with the child.

appeal.

Although C.G. identified J.R. as the father of K.M.G., J.R. asserts in brief that he "was unaware that he was the father of [K.M.G.] when the child was born and when [K.M.G.] first entered the care of the [S]tate." J.R. further asserts that he "did not know that [K.M.G.] was his child until February 19, 2007, which was after [K.M.G.] had entered the custody of the State." J.R. argues that he was unable to complete the requirements of the case plan due to his incarceration. He contends that he "has not had the opportunity to provide support or communicate with the child due to his current circumstances."

As noted above, the grounds for the trial court's termination of J.R.'s parental rights under La.Ch.Code art. 1015 are not raised by J.R. as an issue on appeal. The only issue is whether the termination is in the best interest of the child. La.Ch.Code art. 1037.[6] We find no manifest error in the trial court's conclusion that the State met

---

(2) The parent's failure to communicate with the child.

(3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

(4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

(5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

(6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

[6]Louisiana Children's Code Article 1037(B) provides:

B. When the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven by the evidentiary standards required by Article 1035 and that it is in the best interests of the child, it shall order the termination of the parental rights of the parent against whom the allegations are proven. The court shall enter written findings on both issues. The consideration of best interests of the child shall include consideration of the child's attachment to his current caretakers.

its burden of proving that the termination of J.R.'s parental rights was in the best interest of the minor child.

The evidence revealed that K.M.G. has bonded to his maternal aunt and uncle with whom he has resided since 2006. To the contrary, the child, now two years of age, has never known his biological father. Although J.R. asserts that he was unable to comply with the case plan due to his incarceration, it is noteworthy that J.R. made no effort to contact, support, or establish any relationship with his child even when he was not incarcerated. It was the testimony of the caseworker that, when J.R. was out of jail for approximately six weeks, he made no efforts to comply with any components of the case plan. Additionally, given his criminal history, and his past and present incarceration, the record supports the trial court's conclusion that the best interest of K.M.G. is served by the termination of J.R.'s parental rights which makes the child eligible for adoption.

**TERMINATION OF K.J.G.'S PARENTAL RIGHTS**

The initial case plan established for K.J.G., and approved by the trial court, required that K.J.G. maintain housing, maintain employment, participate in a parenting course, undergo a substance abuse evaluation, participate in a psychological evaluation, resolve any criminal matters, pay child support of $50.00 per month, and visit with the minor children in accordance with the visitation plan. K.J.G. emphasizes that, at the time the minor children came into the custody of the State, he, the non-offending parent, was working out of state in Arkansas. He asserts that, initially, he "was not very involved in complying with his case plan because he did not have permanent housing as a result of his employment in the construction industry that caused him to travel often." Additionally, "[d]uring this period, it was Mr. [G.'s] hope

7

that the mother would work her case plan so that all four children could be reunited with her."

K.J.G. asserts that the case plan goal of reunification was changed to that of adoption by the trial court on August 21, 2007, "in spite of the fact that [he] had begun to work his case plan." He notes that it was due to his efforts, and the progress which he made in completing the requirements of his case plan, that the State's recommended case plan goal was changed from a goal of adoption back to a goal of reunification in February of 2008. In what he terms "an interesting turn of events," in the interim, on March 17, 2008, the Petition for Termination of Parental Rights and Certification for Adoption was filed. K.J.G. also points to his continued efforts in complying with his case plan even after the petition was filed and concludes that "[a]t the time of the termination hearing, [he] had substantially complied with his case plan and was continuing to comply with the one outstanding element of the case plan, i.e., mental health counseling, through actions initiated by him."

The record confirms that K.J.G. did make an effort to comply with the case plan, having undergone a psychological evaluation and completing a substance abuse evaluation and anger management course. K.J.G. also maintained contact with the State from February of 2007 through August of 2007. Although he had secured housing, K.J.G. was unable to pay child support allegedly due to a disability.

K.J.G. also continued his effort and contact with the State in October of 2007 upon his relocating to Texas. Once in Texas, he supplied proof of housing and informed the State as to how he could be contacted. A request was made by OCS of the State of Louisiana to its counterpart in the State of Texas for a home study to be performed in Texas. The home study was performed and approved.

8

For the foregoing reasons, K.J.G. concludes that "[a]t no time after his children came into DSS's custody did [he] demonstrate an intent to abandon his parental responsibilities." The record corroborates the effort made by K.J.G. to comply with his case plan.

## I. K.J.G's Compliance with His Case Plan

K.J.G. contends on appeal that he had completed several components of his case plan, and, thus, it was an error of the trial court to terminate his parental rights due to substantial non-compliance. We find merit in this contention.

*Payment of Financial Contribution*

K.J.G.'s case plan required that he make child support payments of $50.00 per month, per child. The record reveals that K.J.G. made no financial contributions to the children from the initiation of the case plan through August of 2007. On this component of his case plan, K.J.G. asserts that he applied for Social Security disability benefits and had begun to receive same "in either June or July of 2007." Additionally, when he applied for disability benefits, he "made attempts to qualify his minor children to receive benefits . . . and did in fact qualify his children for Social Security disability benefits." Although he admits that the "amount received by each child was not verified, . . . it was verified that the amount was much greater than the $50.00 per month indicated in the case plan." The testimony of the caseworker verified that the minor children of K.J.G. did begin receiving Social Security disability benefits in either May or June of 2007.

*Maintain Stable and Safe Housing*

K.J.G. asserts that he had in fact secured housing and that he provided proof of same as well as the address and telephone number of his whereabouts in Texas. He

9

further notes that a home study was performed in Texas, and the housing he provided was approved. The evidence in the record confirms these assertions.

*Visitation*

K.J.G. notes that "[t]he initial [caseworker] observed that during the visitation periods the children were very interactive with both parents." Additionally, a subsequent caseworker noted that the children were "excited" to see K.J.G. and "observed the bonding between the father and the children and that they wanted to spend more time with [K.J.G.]" K.J.G. further asserts that, even after the termination petition was filed by the State, he continued to visit his children, and he maintained telephone contact with them.

After his disability, K.J.G. moved to Texas to be near his family and a support network. K.J.G.'s sister testified at the termination hearing that she would help him with the children. Though his visitation with his children was limited and left a lot to be desired, he still maintained contact with his children.

*Mental Health Evaluation*

K.J.G. notes that he did institute mental health counseling as he was required to do in his case plan. However, he acknowledges that this component of his case plan was never completed and that he did not begin attending mental health counseling until June of 2008, just weeks prior to trial.

Dr. Ed Bergeron, an expert in the field of family psychology and medical and clinical psychology, evaluated K.J.G. on April 9, 2007. Dr. Bergeron diagnosed K.J.G. with a "dependent personality disorder" which, in his opinion, would not be aided by medication. He testified that the requisite treatment would require "intense mental health counseling" to strive for "overall character change." Dr. Bergeron went

10

on to explain that K.J.G. was likely to get involved in unhealthy relationships and "was [a] very, very high risk to be involved with a partner who would possibly mistreat the children." Although Dr. Bergeron did not conclude that K.J.G. would personally mistreat the children, he did testify that "he would not take corrective action" and was more inclined to "passive abuse." Although at the time of trial K.J.G. had not completed the required mental health counseling, he had in fact instituted the required mental health counseling and should be allowed to continue and complete same for the purpose of effectuating reunification.

*Domestic Violence, Anger Management, and Parenting Skills Classes*

As part of his case plan, K.J.G. was also required to complete a domestic violence counseling class, an anger management class, and a parenting skills class. According to the testimony of the caseworker, K.J.G. had completed the anger management class. K.J.G. also informed the caseworker that he had completed the parenting class, but failed to provide any verification thereof. K.J.G. did not complete the domestic abuse counseling.

## II. Reasonable Expectation of Further Improvement

In short, K.J.G. argues that his achievements discussed above illustrate that there had been an improvement in his condition and that there was a reasonable expectation for further improvement.[7] We agree.

---

[7]Louisiana Children's Code Article 1036(D) provides, in relevant part, as follows:

> D. Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
>
> . . . .
>
> (3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

Dr. Bergeron testified that "[K.J.G.] generated a rather deviant personality profile." Dr. Bergeron stated that the testing indicted that K.J.G. had "low self-esteem, general passivity, . . . dependent orientation," and exhibited an "overuse of denial." He further explained that this was of "particular concern" because K.J.G. would "remain in denial[,]" and his failure to take corrective action would be detrimental to the children. According to Dr. Bergeron, given the personality disorder of K.J.G., "the assumption would be that the problems persist." In Dr. Bergeron's estimation, the best case scenario for treatment of a personality disorder such as that of K.J.G. would be six months. The evidence in the record does support K.J.G.'s assertion that there had been improvement and that there was a reasonable expectation for further improvement. As previously set forth by this court, a parent can show "[r]eformation sufficient to prevent termination of parental rights [which] requires that the parent demonstrate substantial change. . . ." *State ex rel. S.D.G.*, 08-154, p. 20 (La.App. 3 Cir. 11/5/08), 996 So.2d 1242, 1253 (quoting *State in the Interest of D.T., L.T., and M.T.*, 29,796, p. 9 (La.App. 2 Cir. 6/18/97), 697 So.2d 665, 670); *C.D. v. L.C.*, 01-663 (La.App. 3 Cir. 10/3/01), 796 So.2d 844, *writ denied*, 01-2986 (La. 11/20/01), 801 So.2d 1079.

## III. Best Interest of the Children

K.J.G. argues on appeal that the trial court erred in finding that termination of his parental rights is in the best interest of the children. We agree.

In considering this issue, we are mindful that "because the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens, the courts must proceed with extreme care and caution." *State ex rel. S.L.W.*, 06-1560, p. 7 (La.App.

4 Cir. 4/18/07), 958 So.2d 53, 58, *writ denied*, 07-933 (La. 6/1/07), 957 So.2d 183 (citing *State ex rel. J.A.*, 99-2905 (La. 1/12/00), 752 So.2d 806). Additionally, although the State's goal is to secure a permanent home for the children, "while there is still reason to believe that positive, nurturing parent-child relationships exist, the *parens patriae* interest favors preservation, not severance, of natural familial bonds." *Santosky v. Kramer*, 455 U.S. 745, 766-67, 102 S.Ct. 1388, 1401-02 (footnote omitted). Moreover, as the second circuit has recognized, "[a]n order of termination of parental rights, serves, in fact, as the parental death penalty." *State ex rel. S.A.C.,* 41,474, p. 3 (La.App. 2 Cir. 8/23/06), 938 So.2d 1107, 1109.

Notably, in the case at bar, the trial court did not articulate any factual reasons for reaching the conclusion that termination of K.J.G.'s parental rights is in the best interest of the children. The record establishes that K.J.G. was not residing with his children when they were placed in the custody of OCS in 2006. At that time, he was working out of state. According to his testimony, while he was employed, K.J.G. would send financial support for his children. Unfortunately, due to his disability, he was out of work and unable to assist his children financially. Through his efforts, however, he did qualify his children to receive financial assistance in the form of Social Security disability benefits.

As discussed above, K.J.G. also made additional strides in complying with his case plan in an effort towards reunification with his children. While he was not totally successful, his efforts are indicative of his intent to maintain a parental relationship with his children. K.J.G. did not abuse his children. He has no pending criminal charges, no substance abuse problems, and has begun mental health counseling. He also has secured suitable housing in Texas where he has family support.

13

Perhaps most important is the continued relationship between K.J.G. and his children. Despite his relocation to Texas, he would travel to Lafayette to visit with them. According to one caseworker, during K.J.G.'s visits with the children, they were "very interactive" with him. Another caseworker testified that the visits between K.J.G. and his children "went pretty well[,]" and the children "were excited to see [their] dad." When the visits were over, "they still wanted to visit with dad for additional time." The children referred to K.J.G. as "Dad." We find that these facts establish that, although the children were doing well in foster care, they did continue to have a relationship with K.J.G. which he sought to maintain. These actions on the part of K.J.G. corroborate his testimony that he wanted "to get [his] kids back and give them a good life."

The petition seeking termination of K.J.G.'s parental rights was filed by the State on March 17, 2008; however, just one month earlier, the State's recommended goal had been changed from a goal of adoption back to a goal of reunification. Since the State recommended a change of goal from adoption back to a goal of reunification just one month prior to its filing for termination, it is at the very least a rational assumption that there had been improvement and a reasonable expectation for further improvement in K.J.G.'s status not yet warranting the parental death penalty. Because of the finality of the termination of one's parental rights, it is far better to err in favor of reunification than to err on the side of termination. Should K.J.G. falter in the future with his case plan, then termination will be much more certain to follow.

Considering all of the testimony and evidence in the record of these proceedings, we find that the State failed to satisfy its burden of proof by clear and convincing evidence that termination of K.J.G.'s parental rights is in the best interest

of the minor children.  Thus, we find manifest error in the ruling of the trial court that it is in the best interest of the minor children that K.J.G.'s parental rights be terminated and that these children be certified for adoption.

## DECREE

For the foregoing reasons, the judgment of the trial court terminating the parental rights of J.R. is affirmed, and J.R. is assessed with costs relative to his case. The judgment of the trial court terminating the parental rights of K.J.G. is reversed, and that matter is remanded to the trial court for the reinstitution of juvenile proceedings relative to the minor children B.O.G. and D.D.G.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**