# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-0820-JAC

**STATE OF LOUISIANA
IN THE INTEREST OF A.L.D.**

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, NO. J-1643-2007, DIV. B
HONORABLE JOHN C. FORD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

## JIMMIE C. PETERS
## JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, Elizabeth A. Pickett, and J. David Painter, Judges.

**REVERSED AND REMANDED.**

**Tony C. Tillman
Attorney at Law
P. O. Drawer 648
Leesville, LA 71496-0648
(337) 239-7983
COUNSEL FOR DEFENDANT/APPELLANT:**
    **C.T.D.**

**Robert J. Elliott
State of Louisiana
Department Of Social Services
P. O. Box 832
Alexandria, LA 71309-0832
(318) 487-5218
COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Louisiana Department of Social Services**

PETERS, J.

C.T.D. appeals a judgment rendered in favor of the State of Louisiana through the Department of Social Services, Office of Community Services (referred to as "the state" or "OCS") terminating her parental rights to her minor child, A.L.D.[1] For the following reasons, we reverse the trial court judgment and remand the matter to the trial court for further proceedings.

## DISCUSSION OF THE RECORD

A.L.D. was born on September 24, 2006, of an extra-marital relationship between C.T.D., her mother, and B.J.D., her father.[2] She first came to the attention of OCS on January 5, 2007, when OCS received a report of neglect stating that while A.L.D. was in Beauregard Hospital due to an upper respiratory infection C.T.D. failed to show her child any concern or affection. Specifically, the report asserted that, during the hospitalization, C.D.T. did not hold A.L.D., did not bathe herself or A.L.D., and seemed unconcerned about A.L.D. Nineteen days later, on January 24, 2007, OCS received an additional report on A.L.D.'s care, that of inadequate shelter. OCS acted on this report and sought a temporary custody order from the trial court the next day. The trial court granted the temporary custody order the same day, January 25, 2007, and, after a January 30, 2007 hearing, granted OCS continued custody of A.L.D. The trial court signed a judgment to this effect on February 1, 2007.

---

[1]The initials of the children and their parents are used to protect the identity of the minor children. Uniform Rules—Courts of Appeal, Rules 5-1, 5-2.

[2]The trial court judgment also terminated B.J.D.'s parental rights. However, he has not appealed that judgment. Thus, the only issue before us is the correctness of the judgment terminating the parental rights of C.T.D.

On February 22, 2007, C.T.D. and the OCS representatives entered into a case plan, which stated as its principal goal A.L.D.'s reunification with her parents, with adoption as a possible second choice. To meet the reunification goals C.T.D. agreed to take various actions, including participating in psychological evaluation or assessment; participating in parenting classes; maintaining a safe and clean home, including washing the dishes after every meal, sweeping the floors daily, and doing laundry weekly; housebreaking all animals kept inside; practicing proper personal hygiene; and contributing financially for her children "through Support Enforcement if she's assessed an amount." On April 27, 2007, the trial court adjudicated A.L.D. as a child in need of care and continued her custody in the state.

On June 11, 2007, OCS completed a case plan assessment which noted that C.T.D. had participated in a psychological evaluation, had attended parenting classes, had visited with A.L.D. according to the visitation contract, and had allowed the worker in her home for unscheduled visits. However, it also recorded that C.T.D. had moved twice and had "not maintained adequate housing, feces on floor, dog hair on furniture, flies in home." The assessment reiterated the requirement that C.T.D. would contribute financially for her child "through Support Enforcement if she's assessed an amount." It also noted that reunification with the parents remained the plan's goal, with adoption remaining the second choice. Of significance to this litigation is that the assessment also noted that the foster parents had already committed to adopt A.L.D.

On November 11, 2007, OCS filed a petition to terminate C.T.D.'s parental rights. Consistent with this filing, the December 10, 2007 case plan assessment changed the goal to adoption. This assessment noted that C.T.D. had not maintained

2

adequate housing, that she had moved four times,[3] that she did not allow a worker in her home for the October visit, and that she did not complete the in-home parenting with Volunteers of America because she did not have a home of her own. Despite the fact that OCS had started the process to terminate her rights, this most recent assessment continued to require that C.T.D. contribute financially for her child "through Support Enforcement if she's assessed an amount." Additionally, it required that C.T.D. "[c]ontribute for her children financially by providing toys and other necessities for [A.L.D.]."[4]

On August 26, 2008, C.T.D. and L.D. completed a twelve-week Systematic Teaching for Effective Parenting (STEP) program sponsored by the Volunteers of America. In September of 2008, C.T.D. married L.D.[5] The trial on the termination issue occurred on February 11, 2009. At the February 11 trial, the state called five witnesses: Dr. Thomas E. Griffin, III; Beth Bratcher; Shanda Hendersen; Dr. David Atkins; and Sandra Melvin.

Dr. Griffin, a pediatric physician who has treated A.D.L. since her birth, testified that A.L.D. has a significant health problem in the form of asthma. He suggested that A.L.D. is highly susceptible to asthma flare-ups in a dirty and unkept home, particularly one with pets and inhabitants who smoke. In fact, he suggested that her asthma condition is so serious that even with perfect care she will have problems. A.L.D. had her first asthma flare-up when she was three months old; has

---

[3]It is unclear whether this number of moves includes the two recorded in the June 11 assessment.

[4]Although the record contains references to subsequent case plan assessments prepared on June 9, 2008, and November 10, 2008, the December 10, 2007 case plan assessment is the last one filed in the record before us.

[5]L.D. is B.J.D.'s uncle.

had two or three flare-ups a year while in foster care; and, according to Dr. Griffin, each asthma flare-up "can be life threatening and it does present a threat to her life."

Ms. Bratcher is the program manager who oversees parenting classes at Volunteers of America. She testified that C.T.D. attended classes from February 13 through May 1, 2007, and completed the STEP parenting classes. For a year thereafter, beginning in June of 2007, Ms. Bratcher visited C.T.D. and B.J.D.[6] in their home in an effort to work with C.T.D. on improving her parenting skills. During that period of time, she found the house generally in really bad condition. However, when she reinstated her visits beginning in October of 2008, she found that the situation had changed.[7] She found the house generally clean, with the dishes washed and nothing scattered on the floor. Still, she did find some remaining safety hazards: there were no covers on the electrical outlets and no safety locks on the lower kitchen cabinets. Ms. Bratcher was of the opinion that the home was not safe enough to leave a child alone for fifteen minutes.

With regard to observation of C.T.D.'s parenting skills, which was a principal purpose of the visits, Ms. Bratcher testified that C.T.D. utilized very few of the skills she had been taught when visiting with A.L.D. She used as an example the fact that during one of her early morning visits, C.T.D. offered A.L.D. cookies and junk food instead of more nutritious food. However, she acknowledged that she did not raise this point with C.T.D. because C.T.D. had already been through three different courses at that point. Ms. Bratcher acknowledged that living conditions had improved somewhat since C.T.D.'s marriage to L.D., and that despite some lingering

_____

[6]Apparently C.T.D. and B.J.D. continued to reside together until at least June of 2008.

[7]We note that these visits occurred after C.T.D.'s marriage to L.D.

safety issues, the inside of the home has evolved to being pretty clean. The outside of the house was a different story, however, as it contains an old boat, an old RV, and carpentry tools that A.L.D. could get into.

Ms. Henderson had been C.T.D.'s OCS foster care worker since A.L.D. came into OCS's custody in January of 2007. She testified that during the first six months C.T.D. worked with OCS, she attended all of the parenting classes scheduled for her and completed her psychological examination as required. Still, when she visited C.T.D.'s home in June of 2007, there were dogs in the trailer, feces on the floor, no air conditioning, and a strong urine and dog odor. According to Ms. Henderson, when the situation was reviewed in December of 2007, it was mostly the condition of C.T.D.'s home that prevented her from being united with her daughter. Ms. Henderson also reported that although C.T.D. told her that she had quit smoking in August of 2008, she saw C.T.D. smoking while walking into Wal-Mart in December of 2008. Ms. Henderson also claimed that on two unscheduled visits to C.T.D.s home, she observed dirty dishes, floors that needed sweeping, and clothes that needed to be put away. However, she did not testify as to when those unscheduled visits were made.

With regard to the condition of the yard, Ms. Henderson agreed with Ms. Bracher's observations. On her visits after C.T.D.'s marriage, she observed trash and L.D.'s painting equipment scattered throughout the yard. However, in response to Ms. Henderson's concerns in this regard, C.T.D. moved the items in the yard to a common area and tried to clean it up "as best she can."

Despite C.T.D.'s efforts, Ms. Henderson was of the opinion there were still some dangers present. Additionally, Ms. Henderson testified that the inside of the

home, while better than the past, still did not meet minimal standards because of electrical problems, tile on the floor coming up, uneven floors, and lingering odors that would probably aggravate A.L.D.'s allergies. When Ms. Henderson discussed these problems with C.T.D., she was informed that C.T.D. and L.D. were planning to make the appropriate repairs, but were awaiting the outcome of the termination proceedings. Despite the obvious improvement in conditions and C.T.D.'s housekeeping and parenting abilities, Ms. Henderson was still of the opinion that C.T.D. had not progressed to a point that OCS could safely leave A.L.D. alone with C.T.D.

Dr. Atkins, a Shreveport, Louisiana clinical psychologist, saw C.T.D. professionally on two occasions, February 27, 2007, and February 19, 2008. Dr. Atkins testified that C.T.D.'s history of abuse by various people in her life before the age of thirteen would make it unlikely that she could change the way she bonds with, or cares for, children in the near future. While being concerned primarily about C.T.D.'s ability to bond with her child, he testified that "from a purely psychological perspective I find no compelling reason to recommend termination of parental rights," that there were no mental illnesses that would render her incapable of appropriately parenting her child.

Ms. Melvin, who is employed with the Volunteers of America, worked with C.T.D. from December of 2007 until August 28, 2008. In fact, she is the person who initially taught C.T.D. in-home parenting classes and later taught her in the STEP program. In June of 2008 she began home visits with C.T.D. She testified that when C.T.D. married L.D., the inside of the home became less of an issue, although it was "very questionable as to the safety of a child." She observed that the outside of the

6

home was "pretty rough," and that there were furniture, appliances, animal feces, and things strewn in the yard.

With regard to C.T.D.'s interaction with A.L.D., she observed very little emotional attachment and further noticed that C.T.D. paid little or no attention to the child's particular nutritional needs. Although C.T.D. and her new husband, L.D., had completed a STEP parenting class that met once a week for twelve weeks, Ms. Melvin testified that C.T.D. was never able to put into practice the things that she had learned in the parenting classes.

At the hearing, C.T.D. testified that she and her husband, L.D., live in a two-bedroom trailer. She moved into the trailer with L.D. over a year before the hearing. She acknowledged there are no covers on the electrical outlets and no child-proof locks on the lower cabinets. However, with regard to the latter complaint, she testified that she kept only pots and pans in the lower level kitchen cabinets and, therefore, child-proof latches are not necessary. According to C.T.D., when she first moved into L.D.'s home, several animals were present, but by April of 2008 all had been removed. She testified that she is trying to keep the house picked up and cleaner and that she had learned quite a bit from the parenting classes she had taken.

L.D., who is a contractor and painter, took off from work to attend the twelve STEP classes with her and supports her desire to have A.L.D. returned to live with her. She also testified that while A.L.D. had been brought to her home many times by social workers, no one had ever told her that there were problems with their home that would trigger asthma or allergic problems in A.L.D. For the past two years, she has seen A.L.D. only two hours a month, and testified that because of that minimal contact she has had no opportunity to bond with A.L.D. C.T.D. said that she has

7

straightened up the yard, putting her husband's work tools in one area of the yard; that she does not allow A.L.D. to play in the yard unsupervised; and that the child has never been injured on the equipment in the yard. Finally, C.T.D. said that she had quit smoking, that Ms. Henderson was "fibbing" when she testified that she saw C.T.D. smoking in December of 2008.

The trial court took the matter under advisement and, on March 5, 2009, issued written reasons for judgment terminating C.T.D.'s parental rights. After the trial court executed a written judgment to that effect on March 11, 2009, C.T.D. perfected this appeal, asserting that "the Trial Court committed manifest error by finding that the State had met its burden of proof, and that it was in the best interest of the minor child, A.L.D., for the parental rights of her biological mother, C.T.D., to be terminated."

**OPINION**

We review the trial court's findings on whether to terminate parental rights according to the manifest error standard. *State ex rel. B.O.G.*, 08-1103 (La.App. 3 Cir. 3/4/09), 5 So.3d 1018. In *State in the Interest of J.A.*, 99-2905, pp. 7-9 (La. 1/12/00), 752 So.2d 806, 810-11, our supreme court stated:

> In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship, *State in Interest of Delcuze*, 407 So.2d 707 (La.1981). However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. *Lehman v. Lycoming County Children's Serv.'s Agency*, 458 U.S. 502,

102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); *see also State in the Interest of S.M.*, 98-0922 (La.10/20/98), 719 So.2d 445, 452. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. *See, e.g., State in the Interest of S.M..*, 448 So.2d 183, 186 (La.App. 4 Cir.1984); *State in the Interest of Driscoll*, 410 So.2d 255, 258 (La.App. 4 Cir.1982).

The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. LA. CHILD. CODE art. 1001. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration. *State in the Interest of A.E.*, 448 So.2d [183] at 185.

Title X of the Children's Code governs the involuntary termination of parental rights. LA. CHILD. CODE art. 1015 provides the statutory grounds by which a court may involuntarily terminate the rights and privilege of parents. The State need establish only one ground, LA. CHILD. CODE art. 1015, but the judge must also find that the termination is in the best interest of the child. LA. CHILD. CODE art. 1039. *See State in Interest of ML & PL*, 95-0045 (La.9/5/95), 660 So.2d 830, 832. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. LA. CHILD. CODE art. 1035(A); *Santosky v. Kramer*, 445 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that the minimum standard of proof in termination of parental rights cases is clear and convincing evidence).

Thus, the state's burden in this matter was to establish by clear and convincing evidence one of the statutory grounds for involuntary termination of C.T.D.'s parental rights *and* that termination of her parental rights is in A.L.D.'s best interest.

The state brought this action under La.Ch.Code art. 1015(4)(b) and (5), which read as follows:

> The grounds for termination of parental rights are:
> . . .
> (4) Abandonment of a child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
> . . .
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
> . . .
> (5) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

We hold that the trial court clearly erred finding that the state proved either ground by clear and convincing evidence.

### *Louisiana Children's Code Article 1015(4)(b)*

During the time A.D.L. remained in OCS's custody, C.T.D. contributed only diapers, wipes, snacks, and occasional gifts for the support of her daughter. Standing alone, this would be insufficient contributions to the child's care and support. However, both the February 2007 case plan and the subsequent case plan assessments provided that C.T.D. would financially support her child "through Support Enforcement *if she's assessed an amount.*" (Emphasis added.) The record contains

10

no evidence to suggest that C.T.D. was ever assessed an amount to be paid through Support Enforcement. However, the December 10, 2007 case plan assessment states that C.T.D. will "[c]ontribute for her children financially by providing toys and other necessities for [A.L.D.]." C.T.D. minimally complied with this obligation.

We recognize that, as a general rule, a parent cannot avoid providing financial support simply because she has not been ordered to do so in a case plan. *See State in re B.H. v. A.H.*, 42,864 (La.App. 2 Cir. 10/24/07), 968 So.2d 881. Still, without some proof that C.T.D. was able to provide financial support to A.L.D. and was unwilling to do so, La.Ch.Code art. 1015(4)(b) cannot be used as a basis for termination of parental rights. *See State ex rel A.T.*, 06-501 (La. 7/6/06), 936 So.2d 79. In this case, there is no evidence that C.T.D. was able to provide financial support. Furthermore, OCS modified C.T.D.'s support obligation by its own case management plan. It would be fundamentally unfair to allow the state to have it both ways—on the one hand to agree that C.T.D. had no support obligation absent an assessment through Support Enforcement, and on the other hand to use Support Enforcement's failure to assess an amount of support as a basis for termination of parental rights.

Louisiana Children's Code Article 1005(4)(b) cannot be used as a basis for the termination of C.T.D.'s parental rights.

### Louisiana Children's Code Article 1015(5)

Under La.Ch.Code art. 1015(5), the state must prove by clear and convincing evidence that there has been no substantial parental compliance with a court approved case plan, and there is no reasonable expectation of significant improvement in the

near future. Concerning the question of compliance, La.Ch.Code art. 1036(C) provides:

> Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
>
> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
>
> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
>
> (6) The parent's lack of substantial improvement in redressing the problems preventing reunification.
>
> (7) The persistence of conditions that led to removal or similar potentially harmful conditions.

In its petition, the state asserted that both parents failed to avail themselves of services offered in that:

> The respondents, [C.T.D] and [B.J.D.] have both failed any and all efforts of rehabilitation and/or have both failed to substantially comply with their individual case plan for services.
>
> * * *
>
> [S]aid respondents because of their constant behavior, instability and/or refusal/failure to adequately work toward reunification, continue to be unfit to raise said minor child; and further, that there is no reasonable expectation of significant improvement in their condition or conduct, within the near future, considering the age of their minor child and said minor child's need for a safe, stable and permanent home.

12

In interpreting these allegations, we conclude that the state's claim of non-compliance with its case plan arises under La.Ch.Code art. 1036(5) and (6).

In its written reasons for judgment, the trial court stated the following:

[I]t appears that this lady struggled with compliance with the case plan early on but did show some improvement toward the end of the second year when she got rid of the cats and married [L.D.]. However, the testimony of Dr. David Adkins, a child psychologist, makes it clear that she has not shown the kind of progress needed to provide for a safe, stable and permanent home for the child.

We conclude, however, that the trial court was manifestly erroneous in finding that the state established by clear and convincing evidence that C.T.D. violated the provisions of La.Ch.Code art. 1036(5) and (6).

The evidence clearly establishes that C.T.D. participated in the required psychological evaluation, attended parenting classes, completed the twelve-week STEP classes , fulfilled her visitation contract with A.L.D., and participated in both in-home parenting classes and in-home visitations. Although the testimony at trial established that C.T.D. has not yet reached her goal of maintaining housing that will be suitable for a child with A.L.D.'s health problems, there is no question that C.T.D. has participated in the services offered to her and complied with all the required programs. Thus, the trial court clearly erred in finding that the state carried its burden of establishing by clear and convincing evidence that C.T.D. violated the provisions of La.Ch.Code art. 1036(5).

The trial court also factually erred in its interpretation of Dr. Adkins' testimony in finding that C.T.D. had not made substantial improvement in redressing the problems that were preventing reunification with A.L.D. In reaching this conclusion that the trial court's factual findings were clearly wrong, we first note that Dr. Adkins evaluated C.T.D. in February of 2007 and February of 2008; the last evaluation being

13

a year before the trial on the termination issue. Thus, Dr. Adkins could not evaluate any progress C.T.D. had made since February of 2008. Additionally, although Dr. Adkins testified that he did not believe C.T.D. was likely to be able to change the way she parents or bonds with A.L.D. in the near future because of her past history, he had never observed the two of them interacting. The most telling aspect of Dr. Adkins' testimony was when he stated that "there were no mental illnesses that would render [C.T.D.] incapable of appropriately parenting her child."Although Dr. Adkins specified that he still had concerns about C.T.D.'s ability to emotionally bond with her children, he was aware that C.T.D. had made changes. Finally, as Dr. Adkins pointed out, "[w]hether or not a parent keeps their home clean or not is not really a psychological issue." Thus, the trial court clearly erred in finding that the state carried its burden of establishing by clear and convincing evidence that C.T.D. violated the provisions of La.Ch.Code art. 1036(C).

Adding to the fact that all of the witnesses agreed that C.T.D. had made substantial improvements in her housekeeping, the state of her home, and her parenting skills, it is clear that any effort to terminate C.T.D.'s parental rights is premature at best. This case presents an interesting procedural scenario in that OCS's initial case management plan contained an alternate goal of adoption and, despite the testimony of its own case workers that C.T.D. had cooperated in every way with the original case management plan, OCS chose to seek termination of C.T.D.'s parental rights soon after the foster parents agreed to adoption, and less than one year after the child was taken into custody. As pointed out by the supreme court in *State in the Interest of J.A.*, 752 So. at 810, the private interest of both the parent and child must be balanced and, although the best interest of the child is paramount, the parents'

14

interest warrants "great deference and vigilant protection under the law." Additionally, "courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens." *Id.* at 811.

In holding that the trial court clearly erred in finding that the evidence in this matter rises to the clear and convincing standard, we do not conclude that C.T.D. is at this time capable of regaining custody of her daughter and we recognize that the issue of termination of C.T.D.'s parental rights might be revisited in the future. However, based on the record before us, we conclude the trial court erred manifestly erred in finding that the state has met its heavy burden of presenting clear and convincing proof.

## DISPOSITION

For the foregoing reasons, we reverse the trial court judgment terminating the parental rights of C.T.D. and remand this matter to the trial court for further proceedings consistent with this opinion. We assess all costs of this appeal to the State of Louisiana through the Department of Social Services, Office of Community Services. Pursuant to La.R.S. 13:5112(A), we set those costs at $2,202.30.

**REVERSED AND REMANDED.**